## Proios v. Proios

510

*Rowley & Smith*, for plaintiff.
*Eugene A. Caputo*, for defendant.

McCreary, P. J., January 11, 1951.—At the above term and number plaintiff filed a complaint praying "that the marriage heretofore contracted between plaintiff and defendant be annulled". The grounds upon which the action for annulment were based, as shown by the complaint, are as follows:

"The parties went through the form of marriage at Washington, Pa., on March 19, 1949, but neither of them intended it to be an actual marriage. The sole purpose of a ceremony was to make a record of a marriage so that defendant, against whom deportation proceedings were pending, could remain in the United States. The marriage has never been consummated. Both of the parties are members of the Greek Orthodox Church and neither one of them considers themselves married without a ceremony conducted according to the rites and rituals of that church. The plans of the parties were that they should be married in the St. Nicholas Greek Orthodox Church at 417 South Dithridge Street, Oakland, Pittsburgh, Pa., on Sunday, July 10, 1949. Just prior to that date defendant was

taken to the hospital suffering from a nervous breakdown and a religious ceremony has never been had.

After hearing, the master made certain findings of fact and drew certain conclusions of law from the testimony on the basis of which he recommended to the court that the prayer of plaintiff be refused. Exceptions were filed by plaintiff and they are now before the court for disposition. Inasmuch as it is the duty of the court of common pleas, in considering exceptions to a master's report, to consider the evidence and make its own findings de novo (Dash v. Dash, 160 Pa. Superior Ct. 317), we will proceed to do so as follows:

### Findings of Fact

1. (a) The name of plaintiff is John J. Proios and the name of defendant is Irene J. Proios, alias Irene J. Vagianos; (b) plaintiff is not a minor and is not incompetent; (c) defendant is not a minor and is not incompetent.

2. The residence of plaintiff is 416 Highland Avenue, Aliquippa, Pa.

3. Defendant is a citizen of Greece, and her last know residence was 1658 Potomac Avenue, Dormont 16, Pa., and her whereabouts at the time of the hearing were the same.

4. Plaintiff has resided continuously in the Commonwealth of Pennsylvania for 22 years.

5. Plaintiff and defendant were married on March 19, 1949, at Washington, Pa.

6. There was no collusion between the parties, the action having been vigorously contested, but we find that the complaint was not made by plaintiff in sincerity and truth for the causes mentioned in the complaint.

7. No children were born of the marriage.

8. The marriage has never been consummated for the reason that both parties are members of the Greek

Orthodox Church, and under the rules of that church the parties are not permitted to have sexual relations with each other after a marriage by civil authorities but they are compelled to wait until the marriage has been blest by a religious ceremony in the Greek Orthodox Church.

9. After the marriage by an alderman on March 19, 1949, at Washington, Pa., the parties made plans for the blessing of the marriage in accordance with the rites, rules and regulations of the Greek Orthodox Church. They made an application to the pastor of St. Nicholas Greek Orthodox Church, 417 South Dithridge Street, Oakland, Pittsburgh, Pa., for the religious ceremony to be held on Sunday, July 10, 1949.

10. Although all of the necessary arrangements had been made by the procuring of a best man, a bridesmaid, the necessary wreaths, the bridal veil and the rings, the marriage ceremony in St. Nicholas Greek Orthodox Church did not take place for the reason that just prior to July 10, 1949, defendant was taken to a hospital suffering from a nervous breakdown, and she was in the hospital on the date set for the religious ceremony.

11. Plaintiff then made up his mind not to go through with the religious ceremony blessing the marriage which had been actually contracted in Washington, Pa., because in his own words, in response to the question, "In other words, you want to annul this marriage now because you found out she is sick—is that the reason?", he said: "That's the reason, yes, sir."

12. On the day of the wedding at Washington, Pa., that is to say on March 19, 1949, plaintiff and defendant exchanged rings at the time of the ceremony, and immediately after the ceremony went to a jewelry store in Pittsburgh where plaintiff bought two rings for defendant, having inscribed thereon the date of

the marriage at Washington, Pa., and the names of the parties.

13. Defendant, under her maiden name of Irene J. Vagianos, entered the United States, in the latter part of December 1948, on a visa that permitted her to remain in this country for a period of three months for the purpose of marrying a veteran of World War II, which entry, for that purpose, was permitted under the laws of the United States.

14. Before the expiration of the three months' visit, it developed that the proposed marriage between defendant and her fiance would never take place, although her fiance was a necessary party to her application for entry for the purpose stated.

15. Plaintiff, at the time, was a resident of Aliquippa, Beaver County, Pa., and had no acquaintanceship with defendant.

16. A friend of plaintiff took plaintiff to the residence of defendant in Dormont for a visit, having in mind the possible marriage of plaintiff to defendant.

17. A week or two following this first visit plaintiff agreed to marry defendant, the marriage being arranged by members of defendant's family in accordance with Greek custom.

18. In accordance with prior arrangements between the parties concerned and the members of defendant's family, the parties went to Washington, Pa., on March 16, 1949, to sign an application for a marriage license, which license, duly issued on March 19th, which resulted in their marriage by Alderman A. R. Cummins.

19. No agreement or arrangement was entered into between the parties to merely go through the form of a marriage ceremony for the purpose of defrauding the United States immigration authorities.

20. By reason of the elaborate preparations which must be made to effectuate a marriage in the Greek

514

Orthodox Church there was not sufficient time left between the date the two parties met at defendant's home in Dormont and March 30th, the date of the expiration of defendant's visa, and they therefore decided to get married by civil ceremony until a later date, the intention of the parties being that they would thereby assure an extension of defendant's visit until such time as they could go through the religious ceremony.

21. They intended the civil ceremony to be a valid marriage not to be consummated, however, until after the completion of the proposed religious ceremony which was set for July 10, 1949.

22. A short time after the marriage of the parties in Washington, Pa., they went to the law office of Ralph F. Smith, Esq., in the City of Pittsburgh, Pa., and there signed an application for extension of the visit of the defendant to this country, and both parties exhibited to the attorney who was preparing the application their marriage certificate dated March 19, 1949, showing that on that date they became husband and wife by the civil ceremony.

23. They not only did not defraud the Government nor intend that the Government should be defrauded, but with the record in its present state it is now possible, under the immigration laws of the United States for defendant to remain here permanently since she is now the wife of plaintiff. Plaintiff's exhibit no. 5, which is a letter sent out by the United States Department of Justice Immigration and Naturalization Service, was introduced in evidence. The contents of this letter are confidential and "the information is furnished for the confidential use of you" (the master) "and the Court in connection with your proceedings".

24. There will be further hearings in a deportation proceedings involving defendant, but it is probable that

decision in the annulment proceedings may have a bearing on defendant's eligibility to remain in the United States.

25. The parties took each other for husband and wife without any mental reservations and one of the purposes of their deliberate entry into the marriage state has been accomplished, namely, defendant was granted an extension of the time of her visit in the United States on the basis of the certification by both plaintiff and defendant that they were married on March 19, 1949, at Washington, Pa.

### Discussion

None of the exceptions filed by plaintiff have any merit and they will accordingly be dismissed. The law of the case is so well set out under the heading "Discussion" by Linas V. Ledebur, Jr., the master appointed by the court, that we feel we should adopt it as a part of our opinion in this case. The analysis of the facts and the law of the case, as evidenced by the master's report, would serve as a model for any member of our bar of long standing, but coming, as it does, from a young man who has been admitted to our bar a little more than one year, it reflects great credit on his ability to comprehend and report on a situation which otherwise might have caused the court much greater labor than was required in this case. We now adopt the master's "Discussion" in toto, incorporate it in this opinion by reference and recommend its thorough perusal by all members of the Beaver County bar.

We might add, however, to the master's discussion of the law and facts of the case one or two further observations. Even if we were to assume, as plaintiff insists, that the parties were married in Washington, Pa., for the sole purpose of defrauding the Government and to induce the Government to extend the visa of defendant, we would not allow plaintiff to take ad-

516

vantage of his own wrong. It has long been the law of Pennsylvania that a court will not assist a plaintiff who cannot prove his case without showing he has broken the law or participated in a fraudulent transaction: Slater v. Slater, 365 Pa. 321.

The case of Borden v. Ellis, 158 Pa. Superior Ct. 259, was not a divorce action, but it became necessary for the court to lay down the law on the subject of unlawful or fraudulent transactions. In that case the court said (pp. 261, 262):

"A contract against public policy cannot under any circumstances be made the basis of a cause of action. If the contract is still executory, the promisor is left undisturbed in the possession of the money or other property which he agreed to pay or transfer; if the contract has been executed, the promisee is left undisturbed in the possession of the money or other property which has been paid or conveyed to him."

This same law prevailed in Pennsylvania before the adoption of section 12 of the Act of May 2, 1929, P. L. 1237, relating to annulment of bigamous marriages. That section has since been amended by the Act of July 15, 1935, P. L. 1013, and since the passage of the Act of 1929, as amended by the Act of 1935, it is no longer necessary that the party seeking the annulment be an innocent or injured party; it is now possible for either party to petition for the annulment of a marriage which is void ab initio for any lawful reason. Prior to the adoption of the Act of 1929, as amended, the courts refused to annul a bigamous marriage where the petition was filed by one who was not an innocent and injured spouse.

In the case of Baker v. Baker, 84 Pa. Superior Ct. 544, Judge Keller said (p. 545):

"We think the term 'innocent or injured party' is to be taken in its common or general meaning, and refers

to one who is free from blame or wrong-doing in the matter. A person who marries another knowing at the time that the latter has a husband or wife living, is not an 'innocent or injured party' within the meaning of the act, and while the law does not in such circumstances legalize the void marriage (Thomas v. Thomas, 124 Pa. 646; Heffner v. Heffner, 23 Pa. 104; Klaas v. Klaas, 14 Pa. Superior Ct. 550) it refuses its aid to one, who, having knowingly contracted such a marriage, later seeks a formal decree of nullification. In such case, it leaves the parties as it finds them."

In the present case, assuming that the marriage was entered into between the parties for the purpose of circumventing the immigration laws of the United States, plaintiff had full knowledge of what was happening, and consequently should not be permitted, at this time, to request the assistance of this court in nullifying the marriage and relieving him of the marital obligations which the marriage imposed upon him. He is not the injured party by the marriage into which he knowingly entered.

Another case in point is Bove v. Pinciotti, 46 D. & C. 159. In that case the marriage was performed at the instance of the supposedly pregnant girl for the purpose of giving a name to the expected child. The parties agreed not to cohabit as husband and wife and did not consummate the marriage by cohabitation. Subsequently, the husband filed annulment proceedings, and Judge Bok of the Court of Common Pleas of Philadelphia County held as follows:

"We are of opinion that the annulment cannot be granted, not only because we believe the policy of the law is against it but because an annulment renders the marriage void ab initio, bastardizes the issue, and hence destroys the very purpose for which the parties married. To say that the failure of the child to ma-

terialize is a failure of consideration and hence avoids the point just made is merely to emphasize the artificiality of comparing the marriage contract to the ordinary civil contract. It is not possible to have a marriage for one purpose and no marriage at all for other purposes, for marriage is not only a contract but a status and a kind of fealty to the State as well. . . .

". . . We know of no authority permitting two persons to split up the incidents and obligations of marriage to suit themselves in this way, nor any, even in the civil law, which permits two people to enter into a contract for the 'ostensible' purpose of affecting the rights of a third and having done so to recede from it at pleasure and without recourse. . . .

"There is no flaw alleged in the formalities of the marriage before us. It was performed by a proper officer of the law after the issuance of a valid license, the young people were not insane or intoxicated or jesting, there is no allegation of fraud, coercion, or duress. They did in proper legal form precisely what they had intended and agreed to do, namely, to get married. What their private motives or reservations may have been is not enough to upset a marriage regular on its face, particularly when they intended it to be so for at least one purpose.

". . . The element which makes a marriage void is the natural or legal incapacity of the parties to contract it, not the private conditions which they choose to attach to it. Marriage is not as yet so private an affair. No incapacity appears here and they must stick to the bargain which they and the State made jointly."

As was said by Judge Baldrige in the case of Eisenberg v. Eisenberg, 105 Pa. Superior Ct. 30, 35:

"It has generally been recognized that marriage is something more than an ordinary civil contract. It

creates a status of vast importance to the social fabric, as well as to the individuals concerned. The rules governing the rescission of an ordinary contract do not obtain in the annulment of a marriage contract; it cannot be dissolved by mutual consent and it is not a contract within the meaning of the statute of frauds: Maynard v. Hill, 125 U. S. 190. Principles are involved, based on vital questions of public policy rather than on abstract contractual rights."

See also Bangor Trust Co. v. Christine, 297 Pa. 64; L. v. L., 67 D. & C. 391; Zisser v. Zisser, 60 D. & C. 21.

The generally held opinion is that fraud itself does not make a marriage void, but at the most voidable, and our divorce law provides that on a showing of fraud a divorce may be obtained; an annulment cannot be procured on the ground of fraud: Masciocchi v. Masciocchi, 72 D. & C. 257.

The burden of proving that the marriage was void for any legal reason is on plaintiff. In our opinion he has not maintained this burden and his action must be dismissed.

We have carefully read the very able brief of argument prepared and submitted by counsel for plaintiff wherein he cites many decisions in States outside of Pennsylvania which indicate that he has substantial merit in his argument. However, in Pennsylvania the law of divorce and annulment is purely statutory and we feel bound by the decisions of our courts, and feel no compulsion to adopt the reasoning of judges in other States where the law of divorce and annulment differ from ours and where the public policy of the State may be entirely different.

In the case we are considering there was something more than a mere formal ceremony. We have the case of two people, both of whom are competent, getting married with the full intention that they be known as

husband and wife and without any mental reservations on the part of either that the ceremony should be otherwise than what it purported to be, and plaintiff cannot now ask the assistance of the court to relieve him from a situation merely because he discovered that his wife was physically unsound before the religious ceremony was performed.

There is not one word of testimony in plaintiff's case which even suggests that the parties were merely going through the ceremony to fool anybody, including the United States immigration authorities. In addition to plaintiff's stating that he wanted an annulment, because he discovered after the marriage that his wife was sickly, he stated in answer to the question, "Why did you do that?":

"We were married that day by the justice in order to file this petition so she wouldn't be sent back to Greece; and we were to have a church wedding later."

Even if this were true, it would be no ground for annulment.

### Conclusions of Law

1. The complaint does not state a cause of action within the meaning of the annulment section of the Divorce Law.

2. Plaintiff has not sustained the burden of proof.

3. The complaint must be dismissed.

Entertaining these views, we make the following

### Order

Now, January 11, 1951, the exceptions to the master's report in the above-entitled case are all dismissed, and it is ordered that the complaint praying that the marriage between John G. Proios and Irene J. Proios, alias Irene J. Vagianos, be annulled is dismissed, costs to be paid by plaintiff; it is further ordered that the record of the testimony in this case, together with the

exhibits, and in particular plaintiff's exhibit no. 5, be impounded for the reason that the information contained in exhibit no. 5 is confidential in nature, being evidence furnished by the United States Government for the purposes of this case; it is further ordered that the record of the testimony and exhibits be kept in a secure place and that they be not open to inspection by anyone, for any purpose, except by the order of this court.