## Tarasi v. Pittsburgh National Bank

Before Watson and Wekselman, *JJ.*

*Louis M. Tarasi, Jr.*, for plaintiff.
*Donald L. Very* and *Anthony J. Bonadino*, for defendants.

WEKSELMAN, *J.*, April 4, 1978—This case is now before the court on motions for summary judgment by defendant Neal Hageal, and by defendants S. Robert Mialki and Pittsburgh National Bank (PNB). Both motions seek judgment as to Count II of plaintiff's complaint on grounds of res judicata and/or collateral estoppel. Count II is a claim for damages based on fraud and deceit allegedly practiced upon plaintiff by defendants. Plaintiff's allegations were the basis of a previous action against Mialki and PNB for damages under section 10(b) of the Securities Exchange Act of June 6, 1934, 48 Stat. 881, 15 U.S.C.A. §78a et seq., and S.E.C. Rule 10b-5, 17 C.F.R. §240.10b-5, which was brought in the United States District Court for the Western District of Pennsylvania at Civil Action no. 74-1078.

The District Court granted summary judgment against plaintiff William Tarasi. That judgment was affirmed by the United States Court of Appeals for the Third Circuit, 555 F. 2d 1152 (3d Cir. 1977). A copy of that opinion was attached to defendants PNB and Mialki's motion for summary judgment as Exhibit A. Plaintiff's petition for certiorari (no. 77-195) was denied by the United States Supreme Court. A copy of the letter notifying PNB's attorney of the denial is attached to PNB and Mialki's memorandum in support of summary judgment as Exhibit B.

The facts in this action are essentially identical to those in the prior Federal action. For summary judgment to be granted there must be "no genuine issue as to any material fact," Pa.R.C.P. 1035(b), and for the purposes of these motions any doubts as to the facts must be resolved in favor of the non-moving party: Ritmanich v. Jonnel Enterprises, Inc., 219 Pa. Superior Ct. 198, 280 A. 2d 570 (1971). During the time when the acts complained of occurred, William Tarasi ran a construction business and a used car lot, and had some dealings involving the purchase, development and sale of real estate. He was not experienced in stock investment and had finished two years of high school before dropping out. S. Robert Mialki was vice-president of the Verona, Pa., branch of PNB. In the course of doing his banking at PNB, Tarasi had come to know and become friendly with Mialki. In December, 1971, William Tarasi purchased 1,200 shares of common stock of Meridian Industries, Inc. for $10,371.50. These shares were bought for Tarasi by Mialki, who was authorized to pay for them from Tarasi's checking account. Tarasi was induced to buy the shares based on representations by Mialki that an impending, unannounced merger

between Meridian and Paragon Plastics would cause the value of the stock to increase substantially. Defendant Neal Hageal was the president of Paragon Plastics. The merger never took place, the price of the Meridian stock declined, and plaintiff sustained a loss in disposing of the shares. Mialki is alleged to have been acting as an agent of PNB and Hageal.

The District Court, by Willson, *J.*, granted summary judgment on the grounds that William Tarasi was barred from recovery by the rule of in pari delicto. In pari delicto is said to be the legal analogue of the equitable "clean hands" doctrine. The Court of Appeals affirmed the trial court ruling on that ground. Specifically, it was held that as a "tippee," that is, a recipient of inside information, William Tarasi violated Rule 10b-5 when he acquired Meridian stock without disclosing the inside information to his seller. Tarasi admitted that he understood that he was acting on an inside tip. Because his actions violated the Federal securities law, Tarasi was precluded from recovering under those same laws. The appeals court did not weigh the relative fault of plaintiff and defendants, but concluded, rather, that they were equally at fault because the conduct of each, if proven, constituted a violation of the securities law.

Pa.R.C.P. 1035 provides as follows: "(b) . . . The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

It is claimed that defendants are entitled to a judgment as a matter of law because the previous

Federal court decision constitutes res judicata or collateral estoppel. In order to bar a subsequent action, the former judgment must have been on the merits: Fleming v. Strayer, 367 Pa. 284, 80 A. 2d 786 (1951); Restatement, Judgments, §48. Although no reported Pennsylvania case has specifically held that a summary judgment is a judgment on the merits, the nature of summary judgment logically entitles it to res judicata effect. The purpose of summary judgment is to save the time and expense of trial when the movant is entitled to judgment, even if all doubts as to the facts are resolved in favor of the non-movant. A judgment based on a demurrer raised by way of preliminary objection has been held to bar a subsequent attempt to re-litigate the same cause of action: Haines Industries, Inc. v. City of Allentown, 237 Pa. Superior Ct. 188, 355 A. 2d 588 (1975). In that case, plaintiff brought an action in trespass based on damages sustained in a fire. The original trial court sustained the city's demurrer (apparently on the ground of governmental immunity), and no appeal was taken. The following year, the Pennsylvania Supreme Court overturned the doctrine of governmental immunity, and plaintiff sought to bring his cause of action again. The new trial court held that the prior judgment was not res judicata. In the opinion cited above, the Superior Court ruled that the finding that the previous judgment was not res judicata was erroneous and ordered the original judgment reinstated. Additionally, summary judgments are given res judicata effect by the Federal courts: Hubicki v. ACF Industries, Inc., 484 F. 2d 519 (3d Cir. 1973). Pa.R.C.P. 1035 is derived from Federal Rule 56, and Federal decisions are frequently used by the Pennsylvania courts as

guides in the interpretation of Rule 1035: 2 Goodrich-Amram 2d §1035:2. Therefore, if the other necessary conditions are met, the prior Federal summary judgment will bar the present state court action. "For the doctrine of res judicata to prevail, there must be a concurrence of four conditions: 1) Identity in the thing sued upon; 2) Identity of the cause of action; 3) Identity of persons and parties to the action; and, 4) Identity of the quality or capacity of the parties suing or sued." (Citations omitted.) Stevenson v. Silverman, 417 Pa. 187, 190, 208 A. 2d 786 (1965), cert. den. 382 U.S. 833, 86 S. Ct. 76. 15 L.Ed. 2d 76.

The operative facts and the actions complained of in this case are identical to those of the prior Federal action. If "thing" is taken to mean the basic subject matter, then the first condition is satisfied. There is no claim that the quality or capacity of the parties differ in this case from that of the Federal action. Plaintiff's arguments that res judicata is not appropriate in this case are based on two contentions: (1) there is no identity of parties; (2) there is no identity of cause of action.

It is true that the named parties differ in the instant case. On plaintiff's side, Virginia Harrigan and George Sampas have been dropped. (Although William Tarasi's wife, Donna, is named in the caption, she does not appear to be a party to Count II.) In addition to PNB and S. Robert Mialki, Neal Hageal is now a defendant. However, the mere addition of parties cannot defeat the effect of res judicata, if those additional parties are in privity with the original parties: Stevenson v. Silverman, supra. That is precisely the situation in this case. Neal Hageal is alleged to be the principal of, and his liability is predicated upon, the acts of S. Robert

Mialki. Under principles of agency, Hageal must be regarded as in privity with the defendants in the original action. His presence as a named defendant does not defeat res judicata as to either Mialki or PNB, and he is entitled to the benefit of the former judgment if that result is appropriate in this case: 1B Moore's Federal Practice, §0.412[6], 1829.

A more difficult question is raised by the contention that there is no identity of cause of action. There are obvious differences between the names and jurisdictional origins of common law fraud and deceit and a Federal securities law claim. It is also obvious, however, that the conduct complained of is exactly the same in both cases. "Identity of cause of action" does not mean simply that the two actions are identically named; that interpretation would be better expressed by the phrase "same cause of action."

"What is a 'cause of action' for the purposes of res judicata cannot be defined with precision. Clearly mere repetition should not be tolerated, whether this is sought through variation in theory or by pleading new facts. The principle of repose, which underlies res judicata, however, deserves a broader and kindlier application than that needed merely to quell a litigious litigant. At the same time application should be so tempered that litigants receive at least one fair day in court." (Footnotes omitted.) 1B Moore's Federal Practice, §0.410[1], 1154-1155.

The Pennsylvania cases offer little guidance in this matter, either in their resolutions of given factual situations (there do not appear to be any analogous to the instant case), or in their theoretical discussions. The following statement does provide a point of departure:

"It is impossible to lay down an all-inclusive and satisfying formula to determine whether or not 'causes of action' are identical. [Footnote omitted.] The cases do perhaps warrant a definition to this extent: for purposes of res judicata, *there is identity of causes of action when in both the old and new proceedings the subject matter and the ultimate issues are the same.* Beyond this, determination of the question must rest in the sound discretion of the courts as applied to the circumstances of each case, having proper regard both to the public policy of res judicata and to the rights of the parties to have every bona fide issue passed upon." McCarthy v. Twp. of McCandless, 7 Pa. Commonwealth Ct. 611, 617, 618, 300 A. 2d 815 (1973). (Emphasis in original.)

No reported cases which have been called to the attention of the court, or which it has been able to discover, in *any* state jurisdiction have ruled on the question of whether a prior judgment in a Federal 10b-5 action bars a subsequent state action for common law fraud, although there is dictum to that effect in Penn Mart Realty Co. v. Becker, 298 A. 2d 349, 352 (Del. Ch. 1972). There is, however, some helpful discussion in Federal decisions where the question has been considered in reverse.

Initially, it should be noted that plaintiff's contention that the Federal court would have had no jurisdiction over this common law claim is incorrect. The Federal court could have entertained the common law fraud count pursuant to the principles of pendent jurisdiction established in United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed. 2d 218 (1966); Hidell v. International Diversified Investments, 520 F. 2d 529 (7th Cir. 1975);

Vanderboom v. Sexton, 422 F. 2d 422 (8th Cir. 1970). Even after the granting of summary judgment, the District Court would have had discretion to continue with the common law claim: Hudak v. Economic Research Analysts, Inc., 499 F. 2d 996 (5th Cir. 1974); 13 Wright, Federal Practice and Procedure §3567, 452-453. It is true that jurisdiction of claims under the Securities Exchange Act of 1934 (but not under the Securities Act of May 27, 1933, 48 Stat. 74, 15 U.S.C.A. 77A et seq.) is vested exclusively in the Federal courts. Notwithstanding their exclusive jurisdiction, some Federal courts have given res judicata effect to state common law fraud judgments: Connelly v. Balkwill, 174 F. Supp. 49 (N.D. Ohio 1959), aff'd per curiam 279 F. 2d 685 (6th Cir. 1960); Kaufman v. Shoenberg, 154 F. Supp. 64 (D. Del. 1954). In Connelly, the court compared the elements of a 10b-5 action with those of Ohio's common law fraud cause of action, and concluded that they were sufficiently identical to support res judicata. A principal focus of the court's inquiry was whether the state action's standard of disclosure was as strict as that of Rule 10b-5.

Other Federal courts which have considered the question have plainly been reluctant to impair their exclusive jurisdiction by granting res judicata effect to state decisions on common law claims: Wellington Computer Graphics, Inc. v. Modell, 315 F. Supp. 24 (S.D.N.Y. 1970); Moran v. Paine, Webber, Jackson & Curtis, 279 F. Supp. 573 (W.D. Pa. 1967), aff'd 389 F. 2d 242 (3d Cir. 1968). Although Moran states: "We recognize that actions under both the Securities Act of 1933 and the Securities Exchange Act of 1934 are based on different elements from common law actions for fraud and de-

ceit in the state courts, and that the same set of operative facts may give rise to separate causes of action." (279 F. Supp. 577) a reading of the entire opinion shows clearly that concern with exclusive Federal jurisdiction was controlling in the decision not to give res judicata effect to a prior state court action. Another Federal court in considering this question has observed that:

"While the state courts lack jurisdiction to determine a direct claim under 1934 Act, if a state cause of action is adjudicated in state court between the same parties and the state cause of action is factually and legally identical to the statutory cause of action created by §§10(b) or 14(a), res judicata, or more appropriately collateral estoppel, effect would still be afforded the state court findings in a subsequent federal action under the 1934 Act. . . . To merely say, however, that one case involved a state cause of action and the other a cause of action within the exclusive jurisdiction of the federal courts is not sufficient." In re Clinton Oil Co. Securities Litigation, CCH Fed. Sec. L. Rep. ¶96,015 at 91,563 (M.D. Kansas 1977).

Thus, it is clear that the mere difference in name and jurisdictional origin do not preclude identity of cause of action between the two actions now being considered. The resolution of this matter will derive from a comparison of the elements involved in the two actions, and an analysis of the function performed by each cause of action.

The non-jurisdictional elements of a 10b-5 action as applied to the facts of this case are (1) the purchase of a security; (2) a material misrepresentation; (3) scienter; (4) reliance; and (5) causally related damages: 2 CCH Sec. L. Rep.

¶22,781 at 16,643. There is some confusion as to the element of reliance. It apparently need not be proven where an omission, rather than a misrepresentation, is alleged. The elements of an action for fraud and deceit in Pennsylvania are: "(1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act [i.e., scienter], (4) justifiable reliance by the recipient upon the misrepresentation and (5) damage to the recipient as the proximate result." Neuman v. Corn Exchange National Bank & Trust Co., 356 Pa. 442, 51 A. 2d 759, 763 (1947).

On the surface, then, it seems as though the movants are correct in their contention that the only difference between the actions is that plaintiff had a lighter burden with respect to the reliance element in the Federal action, and that plaintiff should not escape res judicata because it would be more difficult for him to prevail in the present action. However, although the elements of the two actions are the same in name, those elements can differ substantially as applied by the two jurisdictions, state and Federal. Though statutory in origin, the Federal securities laws are dynamic rather than static, and are as dependent upon judicial interpretation and construction as many common law causes of action. The meaning and significance of the various elements is still being litigated over 40 years after the passage of the 1933 and 1934 Acts. Cf. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed. 2d 668 (1976) (resolving a split among the circuit courts as to whether negligence can satisfy the scienter requirement in a 10b-5 action). There is now a split among the circuit courts as to whether in pari delicto is a defense to a

10b-5 action. The Supreme Court declined to resolve this split when it denied certiorari to the Federal action which preceded the present litigation. The dispute as to the applicability goes to the heart of plaintiff's position as to the motions for summary judgment, and forms the basis for the conclusion that the motions should be denied.

As noted in the material from Moore and McCarthy, supra, for res judicata to apply, it is important that plaintiff have had at least one fair opportunity to have the merits of his claim adjudicated. The manner in which in pari delicto was applied by the Federal courts has deprived plaintiff of such a hearing in this case, insofar as the common law action for fraud and deceit is concerned. This is not simply to say that this court disagrees with the manner in which the Federal courts applied in pari delicto in the previous 10b-5 action. Mere disagreement with the prior result is not a proper basis for denying res judicata effect. However, the analysis as to the applicability of in pari delicto in the circuit court opinion reveals why actions under 10b-5 and common law fraud and deceit are significantly different.

This crucial difference derives from the fact that the Securities Exchange Act of 1934 is a *regulatory* statute whose principal function is to safeguard the integrity of the interstate securities market. Individual parties are only its incidental beneficiaries—witness the substantial amount of litigation as to whether the various provisions (§10(b) in particular) created implied private rights of action or whether they were merely designed to allow enforcement by the Securities Exchange Commission. Concern with the effect on the overall regulatory function of §10(b) and Rule 10b-5 is paramount

in the Third Circuit's opinion in the prior decision. Both plaintiff and defendant (however technically) violated 10b-5. That being established, the court did not weigh the relative culpability of the violators inter se, but proceeded to an extended analysis of the effect of permitting an in pari delicto defense upon the integrity of the securities market. From the point of view of market integrity, the conduct of the parties may well have been equally detrimental, and, therefore, equally culpable. However, the action of common law fraud and deceit does not have the same broad regulatory function. The common law action is concerned with rectifying wrongs as between the individual parties.

Counsel for plaintiff, arguing against affording the prior finding that the parties were in pari delicto collateral estoppel effect, correctly claims that in pari delicto has not been applied in any reported action for common law fraud and deceit in Pennsylvania. This does not end the inquiry. This court cannot agree with plaintiff's counsel's characterization of in pari delicto as a "unique" defense which is inapplicable to common law fraud actions. In pari delicto has been applied principally in two situations: where one party seeks to enforce an illegal contract, and where a party to unlawful conduct seeks an accounting for the profits of activity related to that conduct. The cases dealing with these situations have made sweeping statements which suggest broader applicability of the doctrine of in pari delicto. Thus, in Davis v. Pennzoil Co., 438 Pa. 194, 209, 264 A. 2d 597 (1970) (cited by defendants as "conclusive authority"), the court stated: "In addition, as a matter of state law, this Court will not enforce an illegal transaction, Tucker v. Binen-

stock, 310 Pa. 254, 165 Atl. 247 (1933), and this is particularly so when the illegality involves the violation of a Federal statute. Dippel v. Brunozzi, 365 Pa. 264, 74 A. 2d 112 (1950)."

However, examination of the actual conduct in the cases reveals that the parties against whom in pari delicto (if it may properly be so named; Davis and Dippel involved the separate, though related, principle that courts will not enforce an illegal contract) was applied were guilty of substantial participation in activity which they had reason to know was illegal. Davis was the originator of a scheme to improve the defendant corporation's share prices by manipulative purchases of its own stock by the corporation. Dippel sought to enforce a contract for the portion of the contract price in excess of price levels established by the Federal Emergency Price Control Act of World War II. In Paul v. Paul, 266 Pa. 241, 109 Atl. 674 (1920), the sham partnership was created for the express purpose of fraudulently shielding the true sole proprietor's assets from creditors. In Slater v. Slater, 365 Pa. 321, 74 A. 2d 179 (1950), the opposing parties were brothers who had held themselves out as a partnership for eight years after the actual dissolution in order to deceive the Public Utility Commission, which they feared would diminish the hauling rights under the former partnership's certificate if their true status as individual proprietors were known. The attempt to obtain an accounting in Tucker v. Binenstock, 310 Pa. 254, 165 Atl. 247 (1933), concerned partnership profits from a brewery operated illegally during Prohibition. The court in this last case was willing to consider plaintiff's argument that he was not equally culpable with defendants, though it ultimately rejected the contention.

"Appellee avers he was not active in the conduct of the brewing business, and that things were done without his consent or knowledge. . . . There can be only one conclusion, the record shows that Tucker knew everything that was going on. He knew who sold the product; the books were kept under the direction of their secretary; while he says he never visited the brewery very often, he went to the office, looked over the monthly statements, and knew about the general business of the company each year, the work necessary to be done on the machinery, the expense in repairs, when it began to do business, and finally he admits receiving at least $89,000 directly from the brewing business in which he was not a stockholder. Tucker had just as much knowledge of the business as Binenstock. His explanations cannot destroy the reality of his direct knowledge of the situation." 310 Pa. 261-262.

In addition to these cases indicating that substantial culpability and clearly illegal acts were the basis for application of in pari delicto, there is one more which supports the view that courts should weigh the relative culpability in applying the doctrine. In Smith v. Blanchley, 188 Pa. 550, 41 Atl. 619 (1898), plaintiffs sought restitution of $3,000 paid to defendant. Defendant was a doctor who had treated plaintiffs' daughter for the complications of an illegal abortion. Subsequently the doctor informed plaintiffs that word of the abortion had reached the Humane Society of Pittsburgh, which was about to institute a criminal prosecution against plaintiffs. (In fact, the Society had neither knowledge of the abortion nor authority to institute prosecution.) The doctor said that he was in contact with an agent of the Society and the matter might

be hushed up by paying $3,000 to the agent. Eventually plaintiffs discovered that defendant had simply pocketed the money and brought their action. The lower court granted a compulsory nonsuit on the theory that plaintiffs' action was based on nonperformance of an illegal contract. The Supreme Court reversed, using language which is instructive with regard to the parameters of in pari delicto in Pennsylvania. The court described the position of defendant as physician, agent, and supposed friend of the plaintiffs; then continued:

"May this confidant by falsehood entrap his principal into an illegal intent, get possession of his property or money, and then claim exemption from restitution by pleading that his principals intended an illegal act? We can conceive of nothing more destructive of morals in these relations than to hold such a rule applicable to the facts of the case before us. Such an application would be a license to agents and those occupying confidential relations to plunder their principals." 188 Pa. 554. Although there are some distinguishing factors from the present case, the similarities are significant.

Tarasi, by his deposition, presented himself as a person with little knowledge of the stock market, who reposed his trust and confidence in his banker and supposed friend, Mialki. Although the relationship may not have risen to the level of a fiduciary one for purposes of investment advice, Tarasi (taking the statements in his deposition to be true) clearly placed himself in the hands of Mialki in this matter. The inexperience of Tarasi and the reliance placed on Mialki weigh heavily against granting collateral estoppel effect to the finding of in pari delicto in this common law fraud and deceit action.

The average citizen who is unschooled in the stock market is unaware that it is illegal to invest based upon tips of inside information. Indeed, this person probably believes that such information provides the legitimate means by which the tycoon of the popular imagination parlays his stake into an even larger fortune. This court believes it would be incorrect and unjust to conclude this common law fraud action on the basis of plaintiff's unwitting violation of the Federal securities laws. The same distinction between a regulatory and bilateral action which led to a finding of insufficient identity of cause of action for purposes of res judicata, prevents granting of collateral estoppel effect to the Federal finding of in pari delicto.

"A purchaser who was a party to the illegality of a securities transaction, and equally guilty with the seller, cannot assert such illegality, particularly where the purchaser was aware of the questionable nature of the undertaking. Ordinarily however, a purchaser who participated in an unlawful sale will not be deemed in pari delicto, at least as long as the contract is still executory, unless he connived with the seller to violate the statute, or is equally culpable with him." C.J.S. Securities Regulation §234.

Where the purchasers relied on defendant's superior business experience, they have been permitted to recover, notwithstanding their participation in efforts to deceive the state securities commissioner: Smith v. Turner, 238 C.A. 2d 141, 47 Cal.Rptr. 582 (Dist. Ct. App. 1965).

"The Courts should not be so enamored with the Latin phrase 'in pari delicto' that they blindly extend the rule to every case where illegality appears

somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied." Norwood v. Judd, 93 Cal. App. 2d 276, 289, 209 P. 2d 24. (Dist. Ct. App. 1949)

The motions of defendants for summary judgment will be denied.

### ORDER

And now, April 4, 1978, defendants' motions for summary judgment are denied.